CHASEZ, Judge.
This suit was initiated by A-A-A Foundations, Inc., appellee, hereinafter referred to as Triple A, against Elite Homes, Inc., appellant, hereinafter referred to as Elite Homes, to recover the sum of $1,296.00, *667 allegedly due for certain materials and labor. Judgment was rendered in favor of Triple A and Elite Homes now brings this appeal.
Triple A is a domestic corporation engaged in the business of driving foundation pilings for building construction sites. Elite Homes is a domestic corporation engaged in the business of house and building construction. Triple A .contends that during the month of April, 1966, it was contacted by Elite Homes for an estimate regarding foundation work to be done at a job site in Jefferson Parish. Prior to this contact Triple A had driven a test piling at this same job site and had billed Elite Homes for the work, in the sum of $1,800. The record indicates that this $1,800 charge was paid by a check written on the account of Vultan, Inc. a corporation later shown to be the owner of the land on which the construction site was located.
Triple A alleges that shortly after it submitted the job estimate it was recontacted by Elite Homes and asked to begin the job at the price quoted in the estimate, $11,520. Subsequently during the pile-driving operations it alleges that it was directed to make a change in the materials it was using, by an officer of Elite Homes who was present at the job site. Later when it billed Elite Homes for the job it included on its invoice, submitted in duplicate, extra chárges of $1,296.00 for the materials ordered substituted at the job site and $580.00 for other additional materials furnished by agreement of both parties.
The duplicate invoices were returned, along with a check for $12,100.00, a sum representing the original $11,520.00 estimate plus the second extra charge of $580.00. The name Elite Homes Inc., the addressee on the invoice, had been scratched out and replaced by the name Elite Land Co., Inc. The $1,296.00 charge for the extra materials ordered at the job site had also been scratched out. One copy of the invoice bore this handwritten notation at the bottom, “Our agreement called for 8' concrete you delivered 8' concrete— no extra was asked for, or delivered.” The other copy of the invoice had this notation “our agreement called for 8' concrete and 8' is what was delivered — according to this invoice it would be 1 O' can & concrete which we do not have.”
Elite did not defend this suit below with the argument that extra materials were not used at the job site. Rather it based its defense on the contention that it was not the corporation which had entered into an agreement of any sort with the plaintiff. It alleged that the agreement for the foundation work was at all times between Triple A and Elite Land Company, Inc., or some other corporation, thus it was in no way liable to Triple A for the $1,296.00 sum at issue in this suit.
Mr. Jerome O. Wilson, president of Triple A, testified for plaintiff at the trial below. He stated that he received a telephone call on April 17, 1966 from a Mr. Joe Fritscher, who requested an estimate for a foundation job for Elite Homes. He quoted Fritscher a price estimate for the job and later Fritscher telephoned back an acceptance of this job estimate. Wilson stated that the job contract was never reduced to writing and he had no written figures other than those sent to Elite Homes in the billing invoice.
Wilson testified that his firm also drove the test piling on the job site and billed Elite Homes $1,800.00 for this work. The billing invoice was mailed directly to Elite Homes, and payment in full was received in the form of a check written on the account of Vultan, Inc. Wilson stated that this test pile job was also initated at the request of Mr. Joe Fritscher who identified himself with Elite Homes.
Wilson stated further that during the actual pile-driving operations on the main job he received a telephone call from the foreman at the site, Mr. Henry Dierker, and as a result of this conversation Triple A substituted ten foot concrete cans for the eight foot cans which had been originally *668 ordered by Mr. Fritscher. It was this substitution of materials which resulted in the extra charge of $1,296.00 reflected on the invoices sent to Elite Homes.
Henry Dierker also testified at the trial below. He made the following statements which we find most pertinent to the issues in this case:
“Q. Mr. Dierker, were you an employee of AAA Foundation, Inc.?
A. In March and April of 1966 I was.
Q. In what capacity were you employed?
A. Pile driving superintendent.
O. Were you the pile driving superintendent for AAA Foundation on the job located at Sena Street and Transcontinental Drive?
A. I was.
O. On May 19, 1966 did pile driving activities begin at that site?
A. I wouldn’t know the exact date, but I guess around that time.
Q. Were eight foot cans delivered to the job site?
A. They were.
Q. Were eight foot cans used on that job site?
A. We started to use eight foot cans, but we drove three pilings with eight foot cans. And Mr. Fritscher he identified himself as the owner or the man in charge of the job, and the architect told me to drive them down below the sand. I drove three pieces below the sand and they started to collapse in so I refused to drive any more. We dug around them and put some props on them so the sand wouldn’t fall into the can because if it did we wouldn’t be able to pour the concrete. And Mr. Fritscher and the architect told me don’t drive no more pilings with those cans, to get larger cans, and that’s when I talked to Mr. Wilson about it. We went across the river and got ten foot cans off of a job, another job and substituted them for the eight foot cans. All this was done when this gentleman right here, who identified himself as the owner (indicating) or the architect, I forget his name, I don’t see him in the Courtroom, Mr. West something. They insisted that I drive them below the ground, and you can’t drive a can below the ground because the sand will all fall into the can, and you can’t pour concrete with sand in a can, and it’s impossible to get out. Water is simple to get out because we can pump it out. I can’t drive a can below the surface of the ground.
Also on this particular job at ground level eight foot cans would have been sufficient. But they filled it in with sand about two foot and that raised the ground level up. And I believe that’s where the trouble came in with the cans. That was the reason the cans were too short. They wanted to drive the cans down to the original ground level and they added two feet of sand more and naturally they needed a larger can.
Q. Now, the architect you mentioned was that the engineer by the name of Wethern?
A. That’s the gentleman.
Q. Now, at whose request did you stop driving the piles?
A. This gentleman right here (indicating) and the man that you mentioned.
Q. And he told you to get larger cans ?
A. Positively.
Q. Now, when you drove the eight foot cans who gave you the grade to drive?
A. This gentleman right here (indicating) .
*669 Q. What grade was that P
A. That was below the ground, about eighteen inches below where he had filled it with sand.
Q. In other words, in order to prevent the sand from falling into the can on top of the pile they needed an additional two feet or so?
A. That’s correct, the way they wanted to drive them down. Now, oh'the'original grade that might have been all right, but when he built it up with two foot of sand that left it so high on the cans.
Q. Did you notify Mr. Wilson at that time?
A. I did.
Q. What did you tell Mr. Wilson?
A. I told Mr. Wilson that the owner and the architect said that we have to drive the cans below the sand, and to get larger cans, two foot larger would make it.”
CROSS EXAMINATION:
Q. “What made you think that Joseph Fritscher was the owner?
A. He identified himself as such.
Q. As the owner?
A. As the owner and the man in charge of the construction.
Q. And the other gentleman ?
A. He identified himself as the architect in charge of the building.
O. And which did he say he was, the architect or the engineer?
A. I forget just which, but this is the gentleman that I was taking my orders from.
0. Who was giving the orders to you, the architect or Mr. Fritscher?
A. The architect worked with Mr. Fritscher. But Mr. Fritscher identified himself as the owner and man in charge of the building.
Q. On this particular occasion?
A. On this particular occasion, yes.”
Mr. Joe Hamilton, an employee of Triple A who was also present at the job site, testified in pertinent part at the trial below:
Q. “Mr. Hamilton, were you employed by AAA Foundation during the month of April, 1966?
A. Yes, sir.
Q. In what capacity?
A. Pile driver man.
Q. Were you present at the driving of the piles on Transcontinental and Sena Streets?
A. Yes, sir.
Q. Were eight foot cans delivered to this site?
A. Yes, sir.
Q. Were eight foot cans used?
A. No, sir.
Q. Can you tell me why, or what was the occasion for the change from the eight foot can to the ten foot can?
A. Well, they wanted to drive them deeper.
Q. Pardon ?
A. You know, mud would get in them and sand. They requested them.
Q. Who requested them?
A. Mr. Fritscher and the engineer.
Q. What did he say ?
A. He said he couldn’t have that. He told Mr. Dierker he would have to get longer cans.
*670 0. You were present and you heard this conversation?
A. I heard him tell Mr. Dierker.
Q. Who told them to stop ?
A. Well, the engineer, Mr. Fritscher.
O. Which one?
A. Well, I believe the engineer stopped it.
O. You think the engineer?
A. Yes.
Q. And how do you know that he was the engineer?
A. Well, he identified himself.
Q. The previous gentleman identified him as an architect, did you get that understanding?
A. Well, we get different understandings from them fellows who come on the job, you know.
O. And who is the one who told you all what depth to drive the piles ?
A. Well, Mr. Fritscher, he established himself as the owner. We all thought he was the owner, you know, everybody there.
Q. My question was who is the one who told you all how far to drive the piles and the cans?
A. Mr. Fritscher told Mr. Dierker. He didn’t tell me anything. I overheard it.
O. You mean Mr. Fritscher?
A. Mr. Fritscher.
Q. Who is that?
A. Joe Fritscher, ain’t that his name?
O. What about the engineer or the architect what was his name?
A. I couldn’t tell you.
Q. Now, is he the one who told Dier-ker, or was it Mr. Fritscher here?
A. Well, Fritscher was the one who told him. But the architect stopped it, you know, the job, I’m pretty sure. I’m pretty sure the architect stopped the job, and Fritscher told Dierker to get longer cans.”
Mr. Joe Fritscher was also called upon to testify at the trial below. He was identified as the President of Elite Homes, Inc. and an officer of Vultan, Inc., as well as a member of the board of directors of Elite Land Company, Inc. He admitted that he contacted Jerome O. Wilson of Triple A relative to the pile-driving operation from which this litigation arose. He stated however that he was acting for Vultan, Inc. in his negotiations with Wilson and that he said nothing which would lead Wilson to believe he was representing Elite Homes, Inc.
Fritscher admitted he was present at the job site when the pile-driving operations began, and he was aware of some discussion between the foreman for Triple A and Mr. C. A. Wethern, Fritscher’s engineer on the job, over the materials which were being used there. Fritscher denied ordering new materials other than those originally agreed upon in his negotiations with Mr. Wilson, and in fact stated that he was under the impression that only the materials originally specified were used.
We find the following statements made by Mr. Fritscher under cross-examination to be worthy of particular note here:
Q. Mr. Fritscher, when you called Mr. Wilson of AAA Foundation asking for an estimate did you give him the number of 834-8247 to contact you ?
A. I gave him my private number.
Q. Now, Elite Homes, Inc. was not listed in the phone directory with this number ?
A. No, but when the phone rings if I’m not there to answer my phone my *671 secretary will answer the phone and she will say, “Elite Homes”. -
Q. But they are not listed in the phone directory under this number?
A. No.
Q. Did you identify yourself to Mr. Wilson as Joe Fritscher?
A. Yes, I did.
Q. Did you identify yourself with Elite Homes, Inc.?
A. No, I believe I said Elite Land Company.
Q. If Elite Homes, Inc. wasn’t listed under this particular number how could Mr. Wilson have gotten the name of Elite Homes, Inc. associated with this number.
A. Repeat that ?
Q. If Elite Homes, Inc. was not listed in the phone directory with No. 834-8247, how could Mr. Wilson have the No. 834-8247 and Elite Homes, Inc. if it wasn’t given to him by you?
A. Well, I gave him the phone number and the mailing address.
O. But how could he have gotten the name of Elite Homes, Inc.?
A. Well, I guess Mr. Wilson knows me through Elite Homes. Because he has been in the residential pile-driving business, although he had never driven any piles for us he knows me as being associated with Elite Homes, Inc., I assume.
Q. Prior to this time had Elite Land Company, Inc., done any business, or any building?
A. No, sir.
Q. Had Vultan, Inc. done any building prior to this time?
A. I’m not sure. I think we had.
Q. Elite Homes, Inc. had been in business for sometime, and had a very good reputation for paying bills, et cetera, isn’t that right?
A. Correct.
Q. And these other corporations that you mentioned had no building experience at all, is that not correct?
A. Well, it had some building experience, but not to he compared to Elite Homes.
Q. Now, when you called and asked for that estimate, is it not a fact that you asked for an estimate with eight foot cans?
A. No, I told them with eight foot concrete pilings. But I had asked the man to speak to the engineer for exactly what he wanted so he could give me the price.
Q. And you were present at the time AAA Foundation was driving the cans?
A. No. I was called out there. I think even Wethern was called out there when they were driving the cans.
% í}í íjí ‡
Q. You were present then at the time the engineer requested that the job be stopped in order for them to rectify the falling of the mud into the can ?
A. Well, he didn’t tell them to stop. He just told them they couldn’t continue on with the soil falling in.
Q. You were there when he requested a longer can?
A. No, I don’t think he suggested a longer can. I think the longer can was suggested by someone else out there.
Q. Did you ever notify AAA Foundation as to the error in billing, that it should be billed to Elite Land Company, Inc.?
A. No.
Marion Fritscher, brother of Joe Fritscher, also testified at the trial below. He was identified as the secretary-treas- *672 itrer of Elite Homes, Inc., Elite Land Company, Inc., and Vultan, Inc. He testified that his brother Joe Fritscher was authorized by Vultan, Inc., not by Elite Homes, to negotiate with Triple A for the laying of foundation pilings at the job site in question. He stated that Elite Homes had no interest at all in the construction work there.
He admitted receiving the invoice for $1,800.00 addressed to Elite Homes, Inc. for the test pile, and paying it with a check drawn on Vultan, Inc. He stated that no mention was made to Triple A at that time that the wrong corporation had been billed. Later when the agreement for the main job had been made, and the work completed, he again received Triple A’s invoices for payment. He deleted the name Elite Homes on those statements and substituted the name Elite Land Company, Inc., as well as the charge for $1,296.00 and returned them to Triple A along with a check for' $12,100.00 drawn on Elite Land Company, Inc.
From an examination of all of this testimony and from the exhibits contained in the record we find that the decision of the trial judge is correct. First, we see from his reasons dictated into the record immediately on the conclusion of trial, that he found as a fact that the materials which were originally delivered to the job site were those which had been agreed upon by Mr. Joe Fritscher and Mr. Jerome Wilson. However when the foreman for Triple A began his work with these materials he was advised by Joe Fritscher or his engineer C. A. Wethern, that additional materials were needed. Hence at their insistence the foreman for Triple A notified Mr. Wilson and new materials were then supplied and used. These factual findings are amply supported by the testimony of the foreman Mr. Dierker, and Mr. Joe Hamilton, as quoted above.
As to the question of whether Elite Homes, Inc. is the Corporation liable for the additional materials we find the record amply supports a judgment against it.
Mr. Wilson as president of Triple A was at all times acting under the impression that he was dealing solely with Elite Homes in this matter. This belief was one which was created and fostered by the actions of Mr. Joe Fritscher, the president of Elite Homes. Wilson knew of Fritscher’s position with Elite Homes, and the fact that Elite Homes was very active and highly regarded in the building construction field. On the other hand, the Fritschers themselves admitted that Elite Land Company, Inc. had not previously been engaged in the construction business, and Vultan, Inc. had done very little construction work in the past. Further when Wilson billed Elite Homes, Inc. for the test pile-drive, he was immediately paid the entire $1,800.00, albeit with a check drawn on Vultan, Inc., and no mention was made then that Elite Homes, Inc. was not the contracting party. Finally when the main job was consummated and invoices sent out, they were again mailed to Elite Homes, Inc. It was not until that time that the circumstances as alleged by the defendant, Elite Homes, Inc., were disclosed.
We find that in this situation where the affairs of three corporations are so interwoven, and the president of one purports to act as agent for another in soliciting a contract with a third party, it is incumbent on these corporations to make clear which one of the three is to be regarded as the contracting party. Any misapprehension as to identify created in the mind of this third party by their failure to do so, cannot be used as a defense to suit against any one of them by this third party.
For the reasons hereinabove assigned the judgment of the trial court is affirmed, appellant to pay all costs of this appeal.
Affirmed.